1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| ANA MARTINEZ, | ) | CV09-1222 SVW (PLAx) |
| Plaintiff, | ) | |
| v. | ) | |
| THE BEVERLY HILLS HOTEL AND BUNGALOWS EMPLOYEE BENEFIT TRUST EMPLOYEE WELFARE PLAN, | ) | FINDINGS OF FACT AND CONCLUSIONS OF LAW; ENTRY OF FINAL JUDGMENT |
| Defendant. | ) | [JS-6] |
| THE BEVERLY HILLS HOTEL AND BUNGALOWS EMPLOYEE BENEFIT TRUST, | ) | |
| Counterclaimant, | ) | |
| v. | ) | |
| ANA MARTINEZ, an individual; U.S. BANCORP, a Delaware corporation, d/b/a U.S. BANK, as trustee of the Steve Martinez Special Needs Trust; and ROES 1 though 10, inclusive, | ) | |
| Counterdefendants. | ) | |

**I.    INTRODUCTION**

The Court held a two-day trial on December 9, 2009 and February 3, 2010.   The Court heard evidence regarding the proper standard of review to apply to Defendant's benefits determination.   Having made the following factual findings and thoroughly examined the administrative record, the Court finds that Defendant abused its discretion by unreasonably interpreting and applying the plan when denying Plaintiff's claim for benefits.   The Court vacates the Plan's prior determinations and remands the matter to the Plan to make a proper decision on Plaintiff's claim in the first instance.

**II.   FACTUAL BACKGROUND**

Plaintiff Ana Martinez ("Plaintiff") filed this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a),(e), and (g), for the purpose of obtaining benefits under an employer-provided health insurance plan administered by defendant The Beverly Hills Hotel and Bungalows Employee Benefit Trust Employee Welfare Plan ("Defendant" or "the Plan").

   **A.    Steve Martinez's Condition**

Plaintiff's 15-year-old son Steve Martinez had a severe epileptic seizure at the school playground on April 18, 2005.   As a result of the seizure, he went into cardiopulmonary arrest and suffered a serious brain injury.   (Medical Report of O. Carter Snead III, MD, Dec. 16, 2006, at Ex. 2: 103.)   He was twice diagnosed with hypoxic-ischemic encephalopathy, and was designated as "do not resuscitate."   (<u>Id.</u>)   He

survived, and now lives in a minimally-conscious state and is permanently disabled.  (Id. at 95, 105.)  He is dependent on a ventilator, requires 24-hour supervision, and must fed by a pump.  (Id. at 104.)

In a state court trial against the Los Angeles Unified School District, a jury determined that the school's delayed and ineffective response to Steve's seizure caused him to suffer his serious brain injuries.  The jury returned a verdict for $7.6 million jury verdict against the Los Angeles Unified School District.  The jury's special verdict form categorized the damages award.  (Ex. 11: BHH 731.)  Of the $7.6 million, the largest amount, $3,676,045, covered "[f]uture medical, nursing, hospital, attendant care, equipment and supply expenses."[1]  (Id.)  Another $2,500,000 covered "[f]uture physical pain/ mental suffering/loss of enjoyment of life/physical impairment/ inconvenience/humiliation/emotional distress."  (Id.)  An additional $650,000 was for "[p]ast physical pain/ mental suffering/loss of enjoyment of life/ physical impairment/inconvenience/humiliation/ emotional distress."  (Id.)  The remaining $775,000 covered "[f]uture [l]ost earnings."  (Id.)

In May 2007, shortly after trial, the parties agreed on a $7 million structured settlement, of which $3,676,045 – the exact amount that the jury found to properly account for "[f]uture medical, nursing, hospital, attendant care, equipment and supply expenses" – was placed in a Special Needs Trust to provide for Steve's future health and welfare.  The Special Needs Trust was funded with approximately $1

---

[1] These categories were provided to the jury, and the jury did not further categorize the damages within each category.

million in cash and an annuity paying $13,769 per month (or $165,228 per year), plus 3% annual interest, for the remainder of Steve's life. (Ex. 4: 1; see also Ex. 2: 113-14.)  A payment of $600,000 went to Steve's parents to settle future claims for wrongful death and extraordinary care they provided to their son.  (Ex. 2: 113.)  Another $5,000 was paid to satisfy Medi-Cal liens, and Plaintiff requested that the state court authorize the Special Needs Trust to pay "any additional amount" owed to Medi-Cal "out of the assets of the Trust." (Ex. 2: 108.)  Steve's attorneys recovered the remaining amount of the settlement to cover their fees, court costs, and other litigation expenses.  (Id. at 113.)

**B.   The Steve Martinez Special Needs Trust**

The Steve Martinez Special Needs Trust was established under California Probate Code § 3600 *et seq.*  Plaintiff and her husband are members of the three-person Trust Advisory Committee, which provides non-binding "recommendations and advice" to the court-approved trustee. (State Court Order Approving Settlement, at Ex. 5: 8.)

The state court, in its order approving the Special Needs Trust, recited that "Steve Martinez, the minor, has a disability that substantially impairs his ability to provide for his own care or custody and constitutes a substantial handicap. . . .  He is likely to have special needs that will not be met without the Trust proposed herein.  The money to be paid to the Trust does not exceed the amount that appears reasonably necessary to meet his special needs." (Ex. 5: 5.)  The Special Needs Trust was also authorized to pay Plaintiff (Steve's mother) $4,000 per month to cover the cost of nursing care she provided him (id. at 22), and whatever amount was necessary (around

4

$700 per month at the time) to pay for private health insurance from Pacific Care (Plaintiff's husband's previous insurer).  (Id. at 23; see also Ex. 2: 159-160.)

In addition, the Special Needs Trust recites the purpose of the Trust:

> The intent and purpose of this trust is to provide a discretionary, spendthrift trust, to supplement public resources and benefits when such resources and benefits are unavailable or insufficient to provide for the Special Needs of the Beneficiary. As used in this instrument, the term 'Special Needs' means the requisites for maintaining the Beneficiary's good health, safety, and welfare when, in the discretion of the Trustee, such requisites are not being provided by any public agency, office, or department of the State of California, or of any other state, or of the United States of America.  The funds of the trust may be used as an emergency or backup fund secondary to public resources. Special Needs include without limitation special equipment, programs of training, education and habilitation, travel needs, and recreation, which are related to and made reasonably necessary by this Beneficiary's disabilities.  This is not a trust for the support of the Beneficiary.  All payments made under this Trust must be reasonably necessary in providing for this Beneficiary's special needs, as defined herein.

(Ex. 5: 6-7.)

The Special Needs Trust also grants the Trustee discretionary powers to distribute Trust assets for Steve's benefit:

> The Trustee may distribute from such common fund [constituting the trust estate] to or for the benefit of the Beneficiary during his lifetime, such sums and at such times as the Trustee, in its discretion, determines appropriate and reasonably necessary for the Beneficiary's Special Needs.  In exercising its discretion, the Trustee may take into consideration the recommendations and advice of the Trust Advisory Committee.  In making distributions to the Beneficiary for his Special Needs, the Trustee shall take into consideration the applicable resource and income limitations of the public assistance programs for which the Beneficiary is eligible, and the duties of any persons legally obligated to support the Beneficiary.

(Ex. 5: at 11.)

The Trust specifically explains the method by which the Trust assets leave Steve's eligibility for public assistance unaffected:

If the Trustee and the members of the Trust Advisory Committee determine that it is in the best interest of the Beneficiary to make a disbursement which will cause a reduction or elimination of the Beneficiary's right to receive public benefits, the Trustee and the members of the Trust Advisory Committee shall not be liable for having caused the loss of such benefits.  For purposes of determining the Beneficiary's Medi-Cal eligibility, or Supplemental Security Income (hereinafter referred to as "S.S.I.") eligibility, or eligibility for other governmental assistance programs, no part of the principal or income of the trust estate shall be considered available to said Beneficiary.  In the event the Trustee is requested by any county, state, federal, or other governmental agency, to release principal or income of the trust to or on behalf of the Beneficiary to pay for equipment, medication, or services which Medi-Cal or S.S.I. or some other governmental program is authorized to provide, or in the event the Trustee is requested to petition a court or administrative agency for the release of trust principal or income for any of these purposes, the Trustee is authorized to deny such request and is authorized, in its discretion, to take whatever administrative or judicial steps may be necessary to continue the Medi-Cal or S.S.I. or other governmental program eligibility of the Beneficiary, including obtaining instructions from a court of competent jurisdiction ruling that the principal and income of this trust is not available to the Beneficiary for Medi-Cal or S.S.I. or other governmental program eligibility purposes.

(Ex. 5: 13-14.)

After Steve's death, public assistance programs are to be reimbursed for any benefits they provided, and the residual amounts of the Special Needs Trust (if any) will be paid to creditors of the estate or Steve's heirs.  (Ex. 5: 11-12.)

**C.   Plaintiff's Present Dispute with Defendant**

In the present action, Plaintiff seeks for the Defendant Plan to pay for Plaintiff's son's medical expenses arising out of the seizure and brain injury.  (There is no dispute between the parties that the Plan must provide for Steve's post-injury, unrelated medical needs. See, e.g., Handwritten Notes Titled "meeting with Ana 1/8/08," at Ex. 1: BHH 1139 ("Steve entitled to benefits for any other condition other than catastrophic incident.").)  In a counterclaim filed by Defendant's funding trust, Defendant's funding trust seeks to have the Special

Needs Trust reimburse the Plan's funding trust for these expenses if Defendant is forced to pay for these medical needs.

### D.   Plaintiff's Claim for Benefits

In the early months of 2008, the Plan received inquiries from Steve Martinez's health care providers regarding the Plan's coverage of 24-hour nursing care, feeding supplies (as Steve is fed through a tube), a power wheelchair, a broken arm, a cold, and an eye exam.  (Ex. 1: BHH 1036; 1132; 1148-49; 1191-92; 1195-96; 1203-04; 1206-07.)  The Plan paid benefits for the broken arm, cold, and eye exam, as these costs were unrelated to Steve injuries arising from the 2005 accident. The Plan refused to pay benefits for the nursing care, feeding supplies, and power wheelchair on the ground that they were related to Steve's 2005 injury, and the costs of those medical needs were satisfied by the 2007 settlement with the school district.  (See Oct. 7, 2008 letter, at Ex. 1: BHH 971; 1036.)

### E.   Plaintiff's Previous Health Benefits Plans

When Plaintiff's son Steve was initially injured, Plaintiff's employer-provided health plan paid for Steve's medical expenses.  At that time, the health plan was provided through Blue Cross.  Blue Cross did not require Steve's Special Needs Trust to reimburse Blue Cross for any benefits payments related to the injury.  Nor did Blue Cross subrogate its claims by executing a lien on Steve's Trust, even though the Blue Cross Plan included a subrogation/reimbursement provision. Specifically, the 2005 Blue Cross Summary Plan Description stated that Blue Cross had "a legal claim (lien) to get back the costs we covered, if you get a settlement or judgment from the other person or their insurer or guarantor.  We should get back what we spent on your medical

care." (Ex. 6: BHH 145.)  The July 1, 2007 Summary Plan Description stated that such a lien would recover no more than 80% of the "usual and customary charges for those services in the geographic area in which they are given," and would recover no more than one-third of any final judgment or settlement obtained through litigation.  (Ex. 8: BHH 545-546.)

According to the Beverly Hills Employee Benefit Trust, Blue Cross admitted that it "screwed up" by failing to obtain a lien on Steve Martinez's settlement recovery.  (Ex. 1: BHH 1095.)  Also, Ava White, the Hotel's Director of Human Resources and the plan administrator for the Blue Cross plan, credibly testified to this Court on February 3, 2010 that she instructed Blue Cross to place such a lien and that Blue Cross failed to do so.  At the time, Blue Cross informed White that it had in fact placed the lien.

**F.   The Creation of a New Health Benefits Plan in 2008**

On January 1, 2008, Plaintiff's employer, the Beverly Hills Hotel, formed a new employee medical benefits plan.  Beginning with the 2008 plan year, Plaintiff's employer switched from the Blue Cross plan to a self-funded plan.  This new plan was administered and funded by the newly created Beverly Hills Hotel and Bungalows Employee Benefit Trust. There is no evidence suggesting that the employer changed plans for an improper purpose.  Nevertheless, after the change to the new plan, the plan refused to pay for Steve's medical expenses.

As attested at the February 3, 2010 trial, the Hotel began considering a change in late 2006.  The Hotel's Director of Finance, Janet Jacobs, and Director of Human Resources, Ava White, were concerned that Blue Cross would significantly increase their premiums

in the future.  Their concerns proved well-founded.  In the spring of 2007, the Hotel learned that Blue Cross was planning on raising premiums by approximately 30% for the 2008 plan year.  According to Jacobs, the increased premiums were a result of increased costs faced by Blue Cross's pooling of costs among a large number of employers.  To the Hotel's knowledge, the increased premiums were not related to any particular claims made by the Hotel's employees.

Once the Hotel learned about the potential increase, the Hotel began serious discussions with its broker to consider alternatives.  Based on the evidence presented at trial on February 3, the Court finds that the Hotel's purpose was not to **decrease** the Hotel's benefits expenses, but rather to **avoid increases** such as the 30% proposed increase from Blue Cross.

Throughout 2007, the Hotel considered a number of potential replacement plans, and finally settled on using a self-funded plan.  Through the self-funded plan, all of the health benefits are paid by the Hotel to a separate trust fund, which then funds the plan.  The trust fund (The Beverly Hills Hotel and Bungalows Employee Benefit Trust) is funded solely by the Hotel.  Funds are sent to the trust on a monthly basis at a rate fixed by actuarial data prepared by the Plan's broker Craig Kinghorn.  The funds are deposited to the trust without consideration of the actual benefits paid out in a given period.

The Plan's costs are contained through the use of "stop-loss" insurance, which is effectively a form of reinsurance.  According to Janet Jacobs, the Hotel's stop-loss insurance is triggered when a plan beneficiary makes a claim greater than $100,000 in a single year arising out of a single incident.  Jacobs believes that, were Steve

Martinez covered, the stop-loss insurance would cover any benefits paid on his behalf arising out of the 2005 accident to the extent that the benefits exceeded $100,000 annually.

The key Hotel personnel explained that, although they knew of Steve Martinez's condition at the time that they decided to change plans, they did not know the specific financial details of Steve's settlement.  Importantly, both Jacobs and White credibly testified that they were unaware of Steve Martinez's health costs and did not take Steve's condition into consideration when deciding to switch plans. When they switched plans, their central goal was to achieve a level of cost-stability and cost-containment that was unavailable in the Blue Cross plan.

As things turned out, the self-insured plan successfully achieved the Hotel's goal of cost-stabilization.  Jacobs, the Hotel's Director of Finance, testified that the Hotel's costs stayed roughly similar from 2007 to 2008, and she estimated that from 2008 to 2009 the Hotel's costs increased from approximately $4 million to approximately $4.3 million.

**G.   The Plan's Interactions with Plaintiff in 2008**

In the fall of 2007, Julie Wohlstein of Community Administrators (the claims administrator for the new plan[2]) held a number of mandatory information sessions in which she informed the Hotel's employees about the new plan.  (See Ex. 12.)  Plaintiff attended one of these sessions. Wohlstein approached Plaintiff after noticing that Plaintiff was distraught at the prospect of the new Plan.  To follow up on this

_____

[2] For a discussion on the claims administrator's role and its relationship to the Plan, see the discussion *infra* regarding the appropriate standard of review.

10

initial meeting, Wohlstein and Plaintiff had a further meeting in early January.

Following the early January meeting, the Plan refused to process Plaintiff's requests for benefits relating to Steve's accident-induced medical condition unless Plaintiff signed a lien against the Special Needs Trust.  Julie Wohlstein sent Plaintiff a copy of the proposed lien, and asked Plaintiff to provide background information regarding the causes of Steve's injury and the alternative funding sources available to pay his medical costs.  Wohlstein's letter to Martinez explained that the Plan's "Right of Reimbursement" provision permitted the Plan to "recover benefits paid by the Plan that would be or have also been paid by any person or organization responsible for causing the injury or disease or from their insurance company."  (Letter from JW to AM, Jan. 9, 2008, at Ex. 1: BHH 1129 (paraphrasing Plan language).)  The attached lien provided: "In accordance with the 'Right of Reimbursement' provision of . . . [the Plan] of which I am a participant[,] I hereby agree to reimburse and pay promptly to the Plan an amount not to exceed the aggregate amount of benefits paid to or to be paid to me or my providers of services under said Plan for charges incurred as a result of injury or disease sustained on or about 2005, out of any recovery by settlement, judgment or otherwise, from any person or organization responsible therefor, or from such person's or organization's insurance carrier. . . .  I represent and warrant that no release or discharge has been given with respect to my right of recovery described herein and that I have done nothing to prejudice said rights."  (Ex. 1: BHH 1131.)

Plaintiff declined to sign the lien.  Plaintiff told Wohlstein

that her son's "trust does not cover medical expenses." (Email from AM
to JW, Jan. 11, 2008, at Ex. 1: BHH 1133.) Plaintiff stated that her
son's settlement was related to lost future earnings and loss of
companionship, not future medical expenses. (Email from JW to
administrative officers of Hotel, Jan. 9, 2008, recapping Jan. 8, 2008
meeting, at Ex. 13: BHH 803; handwritten notes titled "meeting with Ana
1/8/08," at Ex. 1: BHH 1138.) Plaintiff informed the Plan that three
sources of funds were available to pay for Steve's medical needs: the
Plan; her husband's Pacificare health insurance (provided through
operation of the Consolidated Omnibus Budget Reconciliation Act
["COBRA"]); and Medi-Cal. (Incident Report, filed by AM with Community
Administrators, at Ex. 1: 1128.)

Wohlstein responded by informing Plaintiff that the Plan would
have to investigate these facts itself: "In order for us to complete
our review to determine Steve's eligibility for benefits, we do need to
formally verify/determine (either with the [Special Needs] Trust
directly or a legal representative on your behalf) that there are no
monies available or that have been set aside for the provision of his
future medical care/expenses." (Email from JW to AM, Jan. 11, 2008, at
Ex. 1: BHH 1133.)

Immediately following these initial discussions, Plaintiff
provided the Plan with contact information for the IBAR Settlement
Company, which is involved in structuring the Special Needs Trust.
(Email from AM to JW, Jan. 11, 2008, at Ex. 1: BHH 1133.) Julie
Wohlstein contacted Georgine Craven of IBAR Settlement and discussed
the nature of the Steve Martinez Special Needs Trust. (See email from
JW to Georgine Craven, Jan. 15, 2008, at Ex. 1: BH 1123.) On January

23, 2008, Craven (on IBAR's behalf) responded to Wohlstein with a letter summarizing the Steve Martinez Special Needs Trust.  A copy of the Special Needs Trust document was attached to this letter.  (Ex. 1: BHH 1106.)  Craven admitted that she was not an attorney but proffered the opinion that "the settlement was not intended to pay for medical care, but rather care not covered by health insurance or public benefits.  The intent of the settlement was to compensate Steve for his injuries and should therefore not be subject to a lien for future care. . . .  Even in it's [sic] broadest sense, normal medical care would not be considered a special need."  (<u>Id.</u>)

## H.  Defendant's Failure to Retain Counsel

Having received the relevant Special Needs Trust documents, the Plan began searching for an attorney to provide advice with respect to Plaintiff's request for benefits.  Emails throughout January and February 2008 refer to an ongoing search for counsel and the desire that a conflicts check be performed as soon as counsel was chosen.[3] (<u>See</u> email from JW to JJ, AW, CK, Jan. 30, 2008, at Ex. 13: BHH 776; email from JW to AW, Feb. 7, 2008, at Ex. 1: BHH 1074.)  Early in this process, Janet Jacobs expressed the desire that the attorney, once selected, "can . . . hopefully clarify with the administrator of Steve's Trust and confirm that those costs associated with the injuries incurred at his school should be covered by Steve's Trust and in fact is what a portion of the Trust was intended to pay for."  (Email from

---

[3] Immediately upon receiving the Special Needs Trust documents, Julie Wohlstein misstated to Plaintiff that "That Trust Agreement and all of the benefit parameters/constraints of your program **were forwarded** and **are being reviewed** by outside legal and benefit professionals in order to be able to make a determination."  (Email from JW to AM and AW, Jan. 29, 2008, at Ex. 13: BHH 792, emphasis added.)

JJ to JW, CK, AW, Jan. 30 2008, at Ex. 13: BHH 773.)

In a subsequent letter recapping the relevant events, Craig Kinghorn (the Hotel's broker and drafter of the plan documents) stated to Kantor & Kantor (Plaintiff's attorneys) that the Beverly Hills Employee Benefit Trust had "retained the services of Brian T. Seltzer of Seltzer, Caplan, McMahon, Vitek [] to provide legal representation related to Ms. Martinez's claim and oversee the proper handling of Ms. Martinez's claim as well as any subsequent appeal." (Email from CK to Kantor & Kantor, Oct. 24, 2008, at Ex. 1: BHH 944.)

However, in the written and oral testimony presented to the Court with respect to the question of whether Janet Jacobs was the final decision-making authority, none of the witnesses testified that they contacted legal counsel when deciding the April 2008 denial or the July 2008 denial of the appeal.  In fact, there was clear, credible testimony to the effect that the **only** individuals involved in the final benefits determination were Janet Jacobs, Ava White, Julie Wohlstein, and Craig Kinghorn.  Janet Jacobs herself even testified that she did not consult with counsel prior to reaching her final decision.

## I.   Summary of Subsequent Events

The remaining material facts are these.  On April 18, 2008, Julie Wohlstein, on behalf of the Plan's claims administrator Community Administrators, informed Plaintiff that her benefits claim was denied. Plaintiff appealed.  On July 20, 2008, Community Administrators informed Plaintiff that her appeal was denied.  The July 20 denial offered Plaintiff sixty days to request an appeal in writing to Community Administrators.  Plaintiff did not file a formal appeal, but in September and October 2008, Plaintiff communicated with the Julie

Wohlstein and the Plan regarding her options for obtaining health insurance coverage (as the family's COBRA health insurance, obtained through Plaintiff's husband, was set to expire).  In early October 2008, Plaintiff retained counsel and soon after brought this suit seeking reinstatement of benefits.

In the meantime, on October 7, 2008, the Plan informed one of Plaintiff's medical providers, LifeCare Solutions, that the Plan would not pay for Steve's "durable medical equipment and Enteral feeding supplies." (Ex. 1: BHH 971.)  The Plan informed LifeCare Solutions that it should bill Medi-Cal for those services and equipment.  (Id.)  It appears that these costs are among the most significant benefits currently being litigated.

## J.   Specific Contents of Denial Letters

### 1.   The First Denial

In explaining its initial denial[4] of Plaintiff's claim on April 18, 2008, the Plan's claims administrator wrote in pertinent part:

> Please be advised that according to the Plan Provisions . . . [on] Page 59, Section A.11 "Coordination With Other Sources of Payment"[,] the claims incurred for home health care services rendered by Lifeline @ Home and subsequent related services have been denied.

> The basis for the denial is as follows:

> Item A.11.3 **Effect on Benefits**

> > "Benefits available from this Plan shall always be considered only after all available benefits have been paid from any other coverage, plan, or policy of benefits in which the Covered Participant participates, whether as a member of a group or as an individual, or _after reimbursement of the expenses from any other source_ for which benefits would normally be provided for under this Plan. . . ."

---

[4] The initial denial is not the operative determination for purposes of this Court's review.  (See discussion infra.)

15

The Plan does not permit payment for claims if there is a third party who is responsible.  There was a third party who accepted responsibility for Steve's disabling condition and in turn, compensated you for his ongoing medical care.  Therefore, you need to look to the Special Needs Trust or the other insurance sources available to him[5] for the provision and payment of his ongoing medical services related to his disabling condition.

(Ex. 1: BHH 1048.)

In short, the key fact (from the Plan's perspective) was that a third party caused Steve's injury.

Plaintiff appealed this determination.

### 2.   The Second Denial

Because the first decision was subject to a mandatory appeal in order for Plaintiff to exhaust her remedies, the Plan Administrator's determination on July 20, 2008 is the operative decision.  (See discussion *infra*.)  In this denial letter, the Plan Administrator wrote in pertinent part:

According to the . . . Plan Document . . . on Page 60, Section A.11 the "**COORDINATION WITH OTHER SOURCES OF PAYMENT**" excerpt states:

". . . benefits from this Plan are always considered only after all benefits which have been exhausted from any other coverage, plan, or policy for which a Covered Participant is eligible for benefits, whether the Covered Participant is entitled to coverage as a member of a group or as an individual and includes any benefits that would have been payable had a claim been properly made for them."

In addition, on Page 62 (see attached) it states how benefits will be administered in so far as they relate to Item A.11.7 "**SUBROGATION**" and Item A.11.8 "**REIMBURSEMENT PROVISIONS**".

Therefore, because there was another party who was determined to be responsible for charges which resulting from Steven's injury/illness [sic – grammar], the Plan upholds their denial of eligibility for benefits for any services relating to the underlying condition of "persistent vegetative state."

(Ex. 1: BHH 1021.)  Attached to the letter were two pages from the Plan

---

[5] Presumably the father's COBRA insurance policy with Pacificare.

16

1  containing all of the cited provisions, as well as all of the other
2  potentially relevant provisions.

3

4  **III.  STANDARD OF REVIEW**

5

6      The following discussion is drawn from the Court's December 22,
7  2009 Order re: Standard of Review.

8      **A.    LEGAL STANDARD**

9      The basic standard of review of an ERISA plan administrator's
10  denial of benefits was articulated by the Supreme Court in Firestone
11  Tire & Rubber Co. v. Bruch, 489 U.S. 101, 114 (1989): "a denial of
12  benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de
13  novo standard unless the benefit plan gives the administrator or
14  fiduciary discretionary authority to determine eligibility for benefits
15  or to construe the terms of the plan."

16      The key issue, then, is whether "the benefit plan gives the
17  administrator or fiduciary discretionary authority." Id.  This inquiry
18  depends on the plan's language.  See Firestone Tire & Rubber, 489 U.S.
19  at 114.  The Ninth Circuit has explained that "for a plan to alter the
20  standard of review from the default of de novo to the more lenient
21  abuse of discretion, the plan must unambiguously provide discretion to
22  the administrator." Abatie v. Alta Health & Life Ins. Co., 458 F.3d
23  955, 963 (9th Cir. 2006) (en banc) (citing Kearney v. Standard Ins.
24  Co., 175 F.3d 1084, 1089 (9th Cir. 1999) (en banc)).  This inquiry
25  requires that the plan documents be "analyzed . . . in detail" to
26  determine whether or not the administrator retains discretion over the
27  relevant decision-making process.  Abatie, 458 F.3d at 964 n.3.

28

Generally, "[t]here are no 'magic' words that conjure up discretion on the part of the plan administrator," and it is sufficient that a plan "grant[] the power to interpret plan terms and to make final benefits determinations." <u>Id.</u> at 963 (citations omitted).  Per the doctrine of *contra proferentem*, ambiguities are construed in favor of the insured, and the insurer must "unambiguously retain[] discretion" in order to benefit from the abuse of discretion standard of review.  <u>Kearney v. Standard Ins. Co.</u>, 175 F.3d 1084, 1090 (9th Cir. 1999) (en banc) (citing <u>Mogeluzo v. Baxter Travenol Disability Benefit Plan</u>, 46 F.3d 938, 942 (9th Cir. 1995); <u>Boque v. Ampex Corp.</u>, 976 F.2d 1319, 1325 (9th Cir. 1992)).

Although there are no "magic words" that are required in order for a plan to confer discretion, it appears that words like "discretion," "construe," and "interpret" are important indicia of discretion.  <u>See generally</u> <u>Abatie</u>, 458 F.3d at 963- 964 (citing examples of language granting discretionary authority); <u>see also</u> <u>Sandy v. Reliance Standard Life Ins. Co.</u>, 222 F.3d 1202, 1207 (9th Cir. 2000) (discretion conferred if "plan documents unambiguously say in sum or substance that the Plan Administrator or fiduciary has authority, power, or discretion to determine eligibility or to construe the terms of the Plan").

## B.   THE PLAN DOCUMENTS

The Plan documents clearly grant Plan Administrator discretionary authority to interpret and apply the terms of the Plan:

> The Plan Administrator, when acting in their capacity as such, shall have the sole and exclusive right to interpret any and all Plan provisions including, but not limited to, any that are ambiguous, equivocal, vague, unclear or indeterminate.  The employer, Affiliated Employers, Agents of the Employer, Covered Participants or other Plan Beneficiary shall rely upon such interpretation by the Plan Administrator as the manifest intention of the Plan.

(A.1.20, at Ex. 1: BHH 288.)  Thus, it is clear that the Plan confers discretion on the "Plan Administrator, when acting in their [sic] capacity as such."

The question addressed at trial was whether the relevant decision-maker, Janet Jacobs, was acting as the Plan Administrator when deciding Plaintiff's case, and if so, whether Janet Jacobs acted as the final decision-maker.  If the Plan Administrator made the final decision to deny benefits, then this Court reviews that decision for abuse of discretion.  However, if a third-party made the final decision, then this Court reviews de novo.

### C.   JANET JACOBS'S ROLE UNDER GOVERNING PLAN DOCUMENTS

Plaintiff first disputes whether Janet Jacobs was properly designated as the Plan Administrator by the governing plan documents.

The Plan defines "Plan Administrator" as "the Beverly Hills Hotel and Bungalows Employee Benefit Trust."  (A.2.73, at Ex. 1: BHH 303.)  The Plan also defines "Trust" as "the Beverly Hills Hotel and Bungalows Employee Benefit Trust."  (A.2.90, at Ex. 1: BHH 306.)

The Plan also contains "ERISA Information," which includes relevant contact information.  (A.5, at Ex. 1: BHH 316.)  This section provides contact information for the Beverly Hills Hotel and Bungalows Employee Benefit Trust.  Article 5.3 lists the "[n]ame and address of the Plan Administrator and named fiduciary" as "Beverly Hills Hotel and Bungalows Employee Benefit Trust, Attention: Janet Jacobs, Authorized Representative."  (A.5.3, at Ex. 1: BHH 316.)  Article 5.5 lists the "[n]ame and address of any trustee or trustees as "Beverly Hills Hotel and Bungalows Employee Benefit Trust, Attention: Janet Jacobs, Authorized Representative."  (A.5.5, at Ex. 1: BHH 316.)  The Summary

Plan Description likewise lists "Beverly Hills Hotel and Bungalows Employee Benefit Trust, Attention: Janet Jacobs, Authorized Representative" as the "Plan Administrator and named fiduciary" and the "trustee." (Summary Plan Description, ERISA Statement, at Ex. 1: BHH 433.)

The final section of the Plan contains a "Signature Page," in which the Plan Administrator endorses the terms of the Plan. This page recites that the Plan was "approved and accepted" by the "Beverly Hills Hotel and Bungalows Employee Benefit Trust." The Beverly Hills Hotel and Bungalows Employee Benefit Trust manifested its acceptance through the signature of Janet Jacobs, who is listed in this document (executed on December 28, 2007) as "Director of Finance," which refers to her position with The Beverly Hills Hotel and Bungalows.[6] (Art. 6, at Ex. 1: BHH 317.) Plan Endorsements A and B contain identical signature pages. (Art. A.12, at Ex. 1: BHH 379; Art. B.12, at Ex. 1: BHH 384.)

In the Agreement and Indenture of Trust for the Beverly Hills Hotel and Bungalows Employee Benefit Trust, the list of "Named Fiduciaries" includes "The Trustee," "The Plan Sponsor," and "The Plan Administrator." (Art. III.2(h), at Ex. 1: BHH 268.) "Trustee" is defined as "[t]he authorized representative or representatives of the Trust (designated by the Employer) holding and managing the fund according to the terms of the Trust Agreement." (Art. III.2(*l*), at Ex. 1: BHH 269.) "Plan Administrator" is defined as "[t]he entity or individual designated in the Plan as the "Plan Administrator." (Art. III.2(j), at Ex. 1: BHH 268.) The Trust document is signed by Janet

---

[6] The Beverly Hills Hotel and Bungalows Employee Benefit Trust had not been created at the time that the Plan documents were executed on December 28, 2007.

Jacobs as "Authorized Representative of Trustee."  (Trust, p. 9, at Ex. 1: BHH 277.)

Thus, it is clear from the governing Plan and Trust documents that Janet Jacobs is the Authorized Representative of The Beverly Hills Hotel and Bungalows Employee Benefit Trust, and is therefore the Authorized Representative of the Plan Administrator.  Although Plaintiff appears to argue that Jacobs status as "Authorized Representative" does not entitle her to act as the "Plan Administrator," Plaintiff's argument overlooks the fact that the Plan Administrator is a legal entity (The Beverly Hills Hotel and Bungalows Employee Benefit Trust) that cannot act without the aid of a flesh-and-blood agent.  See, e.g., Braswell v. United States, 487 U.S. 99, 110 (1988) ("Artificial entities such as corporations may act only through their agents.")  In the present case, Janet Jacobs was the flesh-and-blood "Authorized Representative" who was empowered by the relevant documents to act on behalf of the Plan Administrator.  Accordingly, Janet Jacobs and the Plan Administrator are identical for present purposes.  Accord Zurndorfer v. Unum Life Ins. Co. of America, 543 F. Supp. 2d 242, 256-58 (S.D.N.Y. 2008) ("As a corporation, Unum America can only act through its agents, and there is no indication that Nicholas, Leddy and Flaherty were not acting as Unum America's agents when they made decisions related to plaintiff's claims.  The Court is unaware of any authority which requires a corporation acting as an ERISA fiduciary to limit its choice of agents to carry out its obligations absent a controlling contractual obligation.").

**D.   JANET JACOBS'S ACTIONS WITH RESPECT TO PLAINTIFF'S CLAIM**

Plaintiff next asserts that, even if Janet Jacobs was acting as

the Plan Administrator, third-party delegatee Community Administrators

was responsible for making the final decision to deny Plaintiff's

request for benefits.

It is clear from the relevant Plan documents that Community

Administrators (the third-party administrative delegatee) was only

empowered to make non-discretionary decisions related to plan

administration.[7]  The important question is whether Community

Administrators or the Plan Administrator was the final decision-maker.

Defendant bears the burden of showing that it is entitled to

discretionary review.  See Sharkey v. Ultramar Energy Ltd., Lasmo plc,

_____

[7]   The Plan permits the Plan Administrator to delegate certain non-discretionary authority.  In the language of the Plan, "The Plan Administrator may delegate any ministerial or managerial duties and responsibilities it deems appropriate."  (Art. 1.4.2 [Ex. 1, BHH00285], emphasis added.)  The Ninth Circuit has held that a plan's "[l]anguage that establishes only an entity's right to administer or manage a plan does not confer discretion."  Boque v. Ampex Corp., 976 F.2d 1319, 1325 (9th Cir. 1992) (citations omitted) (emphasis added), cert. denied, 507 U.S. 1031 (1993); accord Black's Law Dictionary 28, 1045 (9th ed. 2009) (defining "ministerial act" as "[a]n act performed without the independent exercise of discretion or judgment"; defining "manger" as "a person who administers or supervises the affairs of a business, office, or other organization").

Accordingly, because the Plan only permitted delegation of non-discretionary "ministerial or managerial duties and responsibilities," any delegatee's acts should be reviewed by this Court de novo.  Cf. Madden v. ITT Long Term Disability Plan for Salaried Employees, 914 F.2d 1279, 1283-84 (9th Cir. 1990), cert. denied, 498 U.S. 1087 (1991) (holding that delegatee's actions are reviewed for abuse of discretion if discretionary authority is delegated); accord Arizona State Carpenters Pension Fund v. Citibank, 125 F.3d 715, 721 (9th Cir. 1997) (where delegatee is delegated non-discretionary functions, delegatee is not an ERISA fiduciary).

Further, the record shows that the Plan Administrator only delegated non-discretionary powers to Community Administrators.  The Administrative Services Agreement between the Plan and Community Administrators, which is incorporated by reference into the Plan (Addendum Three [Ex. 1, BHH00388]), provides that the Plan is responsible for all final benefits determinations.  (See generally Art. 2 [Ex. 9, BHH00652-00656].)

Lasmo (AUL Ltd.), 70 F.3d 226, 229 –230 (2d Cir. 1995); cf. Shelby County Health Care Corp. v. Majestic Star Casino, 581 F.3d 355, 365-66 (6th Cir. 2009) (de novo standard of review where trial court determined that plan administrator had not been responsible for final benefits determination).

Defendant acknowledges that Community Administrators was responsible for the initial decision to deny Plaintiff's request for benefits.  That decision, communicated to Plaintiff on April 18, 2008, is not determinative of the present inquiry. (Ex. 1: BHH 1048.)  As is discussed in greater length *infra*, the relevant decision is the one communicated to Plaintiff on July 20, 2008,[8] which denied Plaintiff's appeal of the initial decision.[9]  (Ex. 1: BHH 1021.)

At trial, Janet Jacobs described her duties as Authorized Representative of The Beverly Hills Hotel and Bungalows Employee Benefit Trust.  These duties include overseeing the Plan and making "final determinations" on issues such as "benefits, interpretation of the plan, things of that nature."  She noted that, "in all cases," the

_____

[8] Erroneously dated June 20, 2008 in the administrative record.

[9] At the second day of trial, Plaintiff suggested that the October 2008 letter from Craig Kinghorn to Kantor & Kantor constituted the operative final benefits determination.  This assertion is misguided.  Although the July 2008 denial provided a second opportunity to appeal, the appeal was required to be made in writing.  There is no evidence that Plaintiff submitted a written appeal, nor was there conclusive evidence that established that Plaintiff submitted an oral appeal.
    More significantly, the October 2008 letter from Kinghorn was a direct response to the letter from Plaintiff's counsel from Kantor & Kantor, yet Kantor & Kantor's initial letter did not purport to be submitting an administrative appeal of the July 2008 determination.  Also, Kinghorn's October 2008 letter, though it includes a subject heading suggesting that it is related to an appeal, does not include any discussion whatsoever of a further appeal, nor does it purport to address any such appeal.

1   initial drafts of her work-product are drafted by Community

2   Administrators, but that she retains final authority over the decision.

3       It is true, as Plaintiff points out, that the administrative

4   record contains relatively little evidence of Jacobs' involvement in

5   the course of events leading up to the July 20, 2008 denial of

6   Plaintiff's appeal, particularly in the period between the April 18,

7   2008 initial denial and the July 20, 2008 denial on appeal.  However,

8   at trial Jacobs credibly testified to her central involvement in the

9   final decision.

10      Jacobs stated that her final decision was informed by her review

11  of the relevant Plan provisions, the relevant facts of Plaintiff's

12  case, and any other information necessary to decide whether the Plan

13  covers Plaintiff's request.  Jacobs stated that Community

14  Administrators provided her with the relevant information, and that she

15  conferred with Ava White (the Human Resources Director of Beverly Hills

16  Hotel and Bungalows), Julie Wohlstein (an employee at Community

17  Administrators), and Craig Kinghorn (the broker who drafted the Plan)

18  in analyzing this evidence.  Jacobs clearly stated that she alone was

19  responsible for the final decision as to Plaintiff's request for

20  benefits.  Notably, Jacobs also testified that she does not merely

21  rubber stamp Community Administrators' initial decision.  Jacobs

22  explained that, out of the appeals she has decided, she reversed

23  Community Administrators' initial decision roughly 20% of the time.

24      Jacobs's testimony is corroborated by documentary evidence in the

25  administrative record, which contains a pair of relevant emails.  Julie

26  Wohlstein of Community Administrators sent an email dated April 29,

27  2008 (shortly after the initial denial) to Ava White, Janet Jacobs,

28

Craig Kinghorn, Mario Jimenez (an employee at The Beverly Hills Hotel and Bungalows), and an additional unidentified person, which said: "Attached please find the letter of appeal just received from Ana [that is, Plaintiff]. . . .  Will pow-wow with you about next step."  (Ex. 1: BHH 1041.)  Jacobs's testimony suggests that more than one of these face-to-face "pow-wows" took place.

There is also evidence in an early May email in which Julie Wohlstein write to Ava White, Mario Jimenez, and Craig Kinghorn to inform them that Wohlstein had talked with Plaintiff and was in the process of gathering the relevant documents.  (Ex. 1: BHH 1040.) Jacobs's testimony suggests that Wohlstein gathered this information and presented it to Jacobs for Jacobs's final decision.

In short, Jacobs was responsible for the final decision on Plaintiff's benefits.  As such, that decision is subject to an abuse of discretion standard of review.

IV.  **CONFLICT OF INTEREST AND PROCEDURAL IRREGULARITIES**

On February 3, 2010, the Court presided over a second day of trial.  The parties presented evidence regarding the nature and extent of Defendant's conflicts of interest, and the nature of extent of Defendant's procedural irregularities in handling Plaintiff's claim. The Court makes the following findings of fact and conclusions of law, and will take these facts into consideration when deciding whether Defendant abused its discretion by denying Plaintiff's request for benefits.

///

## A.   LEGAL STANDARD

The Ninth Circuit has rejected its former "sliding scale" approach to the standard of review, but a conflict of interest remains a "factor to be weighed" in the Court's abuse of discretion analysis.  Montour v. Hartford Life & Acc. Ins. Co., 588 F.3d 623, 631 (9th Cir. 2009).  In analyzing a conflict of interest, the Court must "adjust[] the weight given that factor based on the degree to which the conflict appears improperly to have influenced a plan administrator's decision."  Id. Note, however, that the Ninth Circuit has "'consciously rejected' the 'sliding scale metaphor' that some other circuits had adopted, which involved adjusting the level of 'deference' or 'scrutiny' in the standard of review itself in proportion to the 'seriousness of the conflict.'"  Montour, 588 F.3d at 631 (quoting Abatie, 458 F.3d at 967) (alterations omitted, emphasis added).

This analysis is highly case-specific.  The Supreme Court noted in Metropolitan Life Ins. Co. v. Glenn that the district court must consider the "conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits [,] and . . . the significance of the factor will depend upon the circumstances of the particular case." __ U.S. __, 128 S. Ct. 2343, 2346 (2008).  The court must take conflicts into account even if those conflicts did not affect the plan's ultimate determination.  Montour, 588 F.3d at 631-32. According to the Supreme Court, evidence of conflicts:

> should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims

administration.  It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

Glenn, 128 S. Ct. at 2351.

Similarly, procedural irregularities must also be taken into account when determining if a plan administrator abused its discretion. In Abatie, the Ninth Circuit held that procedural irregularities must be taken into consideration.  "A procedural irregularity, like a conflict of interest, is a matter to be weighed in deciding whether an administrator's decision was an abuse of discretion."  458 F.3d at 971. The court explained that "[w]hen an administrator can show that it has engaged in an ongoing, good faith exchange of information between the administrator and the claimant, the court should give the administrator's decision broad deference notwithstanding a minor irregularity."  Id. at 972.

As with conflicts of interest, the inquiry focuses on the significance of the procedural irregularity.  "A more serious procedural irregularity may weigh more heavily."  Id.  In a "rare class of cases," an administrator's decision to deny benefits should be reviewed de novo if "an administrator engages in wholesale and flagrant violations of the procedural requirements of ERISA, and thus acts in utter disregard of the underlying purpose of the plan as well."  458 F.3d at 971.  The Ninth Circuit's example of this principle is Blau v.

1  <u>Del Monte Corp.</u>, 748 F.2d 1348, 1352 (9th Cir. 1984), *abrogation on*

2  *other grounds recognized by* <u>Dytrt v. Mountain State Tel. & Tel. Co.</u>,

3  921 F.2d 889, 894 n.4 (9th Cir. 1990).  As explained in <u>Abatie</u>, 458

4  F.3d at 971, "In <u>Blau</u>, the administrator had kept the policy details

5  secret from the employees, offered them no claims procedure, and did

6  not provide them in writing the relevant plan information; in other

7  words, the administrator 'failed to comply with virtually every

8  applicable mandate of ERISA.'"  The <u>Blau</u> administrator's extensive

9  procedural violations operated as a "substantive harm" on the

10  participants.  <u>Blau</u>, 748 F.2d at 1354.

11      The ultimate inquiry remains whether the plan abused its

12  discretion.  In order to account for conflicts of interest and

13  procedural irregularities, "the court should adjust the level of

14  **skepticism** with which it reviews a potentially biased plan

15  administrator's explanation for its decision in accordance with the

16  facts and circumstances of the case."  <u>Montour</u>, 588 F.3d at 631 (citing

17  <u>Abatie</u>, 458 F.3d at 969; <u>Saffon v. Wells Fargo & Co. Long Term</u>

18  <u>Disability Plan</u>, 522 F.3d 863, 868 (9th Cir. 2008)) (emphasis added).[10]

19  On the other hand, the Ninth Circuit has "'consciously rejected' the

20  'sliding scale metaphor' that some other circuits had adopted, which

21  involved adjusting the level of '**deference**' or '**scrutiny**' in the

22

23  _____

24      [10] The Ninth Circuit distinguishes between a heightened level of
   "skepticism," which is appropriate, and a heightened level of

25  "scrutiny," which is not appropriate.  <u>Montour</u>, 588 F.3d at 631.  It
   is admittedly unclear how an enhanced "level of skepticism" is

26  different from an enhanced "standard of review," but it is well-
   established that the Court must take conflicts of interest and

27  procedural irregularities into account in its final analysis.  In
   light of the Ninth Circuit's teachings, the Court will exercise the

28  requisite level of **skepticism**.

1   standard of review itself in proportion to the 'seriousness of the
2   conflict.'" <u>Montour</u>, 588 F.3d at 631 (quoting <u>Abatie</u>, 458 F.3d at 967)
3   (alterations omitted, emphasis added).

4   **B.   FINDINGS AND ANALYSIS REGARDING CONFLICTS OF INTEREST**

5        There is a clear structural conflict of interest.  Benefit
6   determinations are made by the same entity that funds the Plan.  As
7   Janet Jacobs testified and the documents support, the Beverly Hills
8   Hotel funds the Beverly Hills Hotel Trust, which in turn funds the
9   Plan.  In fact, Janet Jacobs serves as both the Hotel's Director of
10  Finance and as the Plan Administrator.[11]

11       This is a classic example of a conflict of interest.  "A conflict
12  of interest exists 'where it is the employer that both funds the plan
13  and evaluates the claims.'  This is because 'every dollar provided in
14  benefits is a dollar spent by the employer; and every dollar saved is a
15  dollar in the employer's pocket.'" <u>Anderson</u>, 588 F.3d at 648 (quoting
16  <u>Glenn</u>, 128 S. Ct. at 2348) (internal citations and alterations
17  omitted).  The employer "both decides who gets benefits and pays for
18  them, so it has a direct financial incentive to deny claims." <u>Saffon</u>,
19  522 F.3d at 868.  This is true even though the Hotel's funds flow
20  through a separate trust.  Generally, the use of the separate trust is
21  a "less significant conflict compared to plans with benefits paid
22  directly by employers."  See <u>Burke v. Pitney Bowes Inc. Long-Term</u>

23  ─────────────────

24  [11] Plaintiff also notes that Janet Jacobs serves as Plaintiff's direct
25  supervisor, but this fact is not significant.  To the extent that
    this issue is even relevant, Defendant took active steps to reduce
26  potential bias and to promote accuracy, for example, by walling off
    claims administrators from those interested in firm finances, or by
27  imposing management checks that penalize inaccurate decisionmaking
    irrespective of whom the inaccuracy benefits." <u>Glenn</u>, 128 S. Ct. at
28  2351.

Disability Plan, 544 F.3d 1016, 1026 (9th Cir. 2008).  But in this
case, as Plaintiff notes, the Plan's administrative services agreement
with Community Administrators shows that the plan is funded both by the
separate trust and the Beverly Hills Hotel's "general assets."  The
agreement states:

> 2.2.5.4. Funding of Payment Account.  Plan Sponsor [Beverly Hills
> Hotel] shall fund the payment account from a trust account, **the
> Plan Sponsor's general assets, or combination of the two**, in the
> amount requested by Contract Administrator [Community
> Administrators] within two days of such funding request.

(Ex. 9: BHH 658, emphasis added.)  Accordingly, the employer's use of a
separate trust does not ameliorate the conflict.

When weighing the conflict of interest, the court looks in
particular for "evidence of malice, of self-dealing, or of a
parsimonious claims-granting history."  Abatie, 458 F.3d at 968.  The
Ninth Circuit has explained the nature of this analysis:

> We weigh such a conflict more or less heavily depending on what
> other evidence is available.  We view the conflict with a low
> level of skepticism if there's no evidence of malice, of self-
> dealing, or of a parsimonious claims-granting history.  But we may
> weigh the conflict more heavily if there's evidence that the
> administrator has given inconsistent reasons for denial, has
> failed adequately to investigate a claim or ask the plaintiff for
> necessary evidence, or has repeatedly denied benefits to deserving
> participants by interpreting plan terms incorrectly.

Saffron, 522 F.3d at 868 (internal quotations, citations, and
alterations omitted).

Here, there is no evidence of malice, self-dealing, or
parsimonious claims-granting.  Thus, the structural conflict is less

significant than it would be if such evidence had been presented.

Nevertheless, the structural conflict is not a meaningless factor in the present case.  At the first day of trial, Janet Jacobs testified that she puts the Plan's interest ahead of the participants' interests. This is a plain misunderstanding of the requirements of ERISA.  As the Supreme Court recently stated, "ERISA . . . sets forth a special standard of care upon a plan administrator, namely, that the administrator 'discharge its duties' in respect to discretionary claims processing 'solely in the interests of the participants and beneficiaries' of the plan." Glenn, 128 S. Ct. at 2350 (citing 29 U.S.C. § 1104(a)(1) (alteration omitted).  Obviously, when a Plan Administrator believes that her primary obligation is to the Plan itself rather than the participants, she is not discharging her duties "solely in the interests of the participants and beneficiaries."  In light of Janet Jacobs's misunderstanding of her legal duties, the Court accordingly will examine her actions with more skepticism than it would otherwise exercise.

In addition, Defendant has not presented significant evidence that it has "taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits." Glenn, 128 S. Ct. at 2351.  It is true that Janet Jacobs testified without contradiction that she "wears two hats" -- one as Director of Finance, and the other as Plan Administrator.  But this is not what the Supreme Court had in mind when it recommended "walling off claims administrators from those interested in firm finances." See id.

Informal "hat-wearing" is not a meaningful way to mitigate conflicts.

To Defendant's benefit, Defendant has shown that "its employees do not have incentives to deny claims." Abatie, 458 F.3d at 969 n.7.  The Plan Administrator Janet Jacobs, her colleague Ava White, and the third-party administrative representative Julie Wohlstein all testified that they are compensated through a salary and (where applicable) a bonus that is not tied to the Plan's claims-processing.  To the extent they have a personal financial interest in denying Plaintiff's request for benefits, their interest is so attenuated as to be practically nonexistent.  Further, they credibly testified that their actions with respect to Plaintiff's claims were not motivated by personal financial interest or the Beverly Hills Employee Trust's financial interest.  As such, Defendant has presented evidence tending to mitigate the Plan's structural conflict of interest.

Defendant also presented testimony regarding the Plan's "stop-loss" insurance.  Janet Jacobs believes that this insurance covers any claims greater than $100,000 per year arising out of a single incident, and Plaintiff has not contradicted this belief.  Because the Plan is funded by the Hotel, this insurance coverage provides the Hotel with significant protection from extremely large benefits requests (such as Plaintiff's).  Thus, even though the Hotel had a direct financial interest in reducing benefits payments, the stop-loss insurance qualifies as an "active step[] to reduce potential bias" in the claims-determination process.  See Glenn, 128 S. Ct. at 2351.  Using the language of Abatie, the stop-loss insurance "minimized any potential financial gain through structure of its business."  458 F.3d at 969 n.7.  This is another factor that mitigates the impact of the Plan's

conflict of interest.

Most importantly, the structural conflict of interest had no impact whatsoever on the Hotel's decision to change plans in January 2008 or on the Plan's decision to deny Plaintiff's request for benefits.  The evidence presented at trial establishes that the Hotel did not create the Plan or administer the Plan in a manner directed at Steve Martinez's situation.  Rather, the Hotel determined that its rates under Blue Cross (its previous provider) were subject to significant potential increases from year-to-year.  The Hotel examined a number of potential plans for both 2007 and 2008, and determined that a self-funded plan would provide the Hotel's desired level of cost-stability and cost-certainty.  Notably, the Hotel's switch to the self-funded plan did not result in any cost **savings**; rather, the switch resulted in nearly identical costs as between 2007 and 2008.  Thus, the structural conflict of interest did not have any identifiable effect on the Hotel's decision to switch to a self-funded plan that did not cover Plaintiff's claims.

In light of these various conflict-related considerations, the Court will examine the Plan's decisions with additional skepticism.  This is not a case where the conflict of interest is at the "vanishing point," Glenn, 128 S. Ct. at 2351, as Defendant failed to take even the simplest steps of separating its financial personnel from its benefits personnel.  However, this is not a case where the conflict of interest is of "great importance," id., as Plaintiff has not identified any evidence that Defendant's conflict affected this particular claims determination or that Defendant has a history of biased or improper claims determinations.  Accordingly, the Court will take the Plan's

1   basic structural conflict of interest into account, but will not

2   exercise as much skepticism as it would if Plaintiff had introduced

3   evidence that this structural conflict had an effect on the Plan's

4   decisionmaking.

5   **C.   FINDINGS AND ANALYSIS REGARDING PROCEDURAL IRREGULARITIES**

6        Minor procedural irregularities have little effect on the analysis

7   if the administrator "engaged in an ongoing, good faith exchange of

8   information between the administrator and the claimant." Abatie, 458

9   F.3d at 972.  However, if the plan administrator's decision is affected

10  by both conflicts of interest and procedural irregularities, the court

11  must examine their decision with increased skepticism.  As the Ninth

12  Circuit has stated:

13       we may weigh the conflict more heavily if there's evidence that

14       the administrator has given inconsistent reasons for denial, has

15       failed adequately to investigate a claim or ask the plaintiff for

16       necessary evidence, or has repeatedly denied benefits to deserving

17       participants by interpreting plan terms incorrectly.

18  Saffon, 522 F.3d at 868.

19       Here, the Plan engaged in some procedural irregularities.[12]  The

20  Plan did not comply with ERISA regulations in making a timely benefits

21  determination.[13]  In communicating the determinations, the Plan did

22

_____

23  [12] In compiling the procedural irregularities, the Court notes that

24  Plaintiff is **not** suing under 29 U.S.C. § 1132(c)(1)(B) (as amended by
    29 C.F.R. § 2575.502c-3) for a $110/day fine arising out of a plan

25  administrator's failure to provide documents following a valid
    request for those documents per 29 U.S.C. § 1024(b)(4).

26

27  [13] The initial decision should have been communicated to Plaintiff
    within 15 days, 29 C.F.R. § 2560.503-1(f)(2)(iii), but was not
    actually decided for 81 days.  The appeal should have been decided

28  within 60 days, 29 C.F.R. § 2560.503-1(i)(2)(ii)-(iii), but was not

provide Plaintiff with the proper information regarding Plaintiff's

appeal rights,[14] did not provide Plaintiff was the proper amount of time

in which to appeal,[15] and did not provide Plaintiff with the proper

documentation of the Plan terms.[16]  When Plaintiff requested copies of

the Plan documents, the Plan requested a copying fee of 70 cents per

page, which far exceeds the regulatory maximum of 25 cents.[17]  In making

its determinations, the Plan failed to provide the relevant plan

provisions to Plaintiff free of charge as is required.[18]  The Plan also

decided for 64 days.

[14] The letters to Plaintiff failed to include the required
"description of any additional material or information necessary for
the claimant to perfect the claim and an explanation of why such
material or information is necessary," and "description of the plan's
review procedures and the time limits applicable to such procedures,
including a statement of the claimant's right to bring a civil action
under section 502(a) of the Act following an adverse benefit
determination on review."  29 C.F.R. § 2560.503-1(g)(2)(iii)-(iv); 29
C.F.R. § 2560.503-1(j)(2)-(4).

[15] ERISA group health plans must "[p]rovide claimants at least 180
days following receipt of a notification of an adverse benefit
determination within which to appeal the determination."  29 C.F.R. §
2560.503-1(h)(3)(I).
     The Plan only provided Plaintiff 60 days to appeal.

[16] When a decision is being reviewed, "a claimant shall be provided,
upon request and free of charge, reasonable access to, and copies of,
all documents, records, and other information relevant to the
claimant's claim for benefits."  29 C.F.R. § 2560.503-1(h)(2)(iii).

[17] The *maximum* reasonable copying rate is 25 cents per page.  29
C.F.R. § 2520.104b-30(b).  Throughout its interactions with
Plaintiff, Defendant insisted that the Department of Labor's
prescribed rate was 70 cents per page.  Not only was Defendant
incorrect about the applicable regulation, but Defendant failed to
acknowledge that the regulation limits the amount to the
*actual* copying rate.  The regulatory rate sets a *ceiling*, and plans
are not permitted to charge the regulatory rate if their actual costs
are lower.  See McDonald v. Pension Plan of NYSA-ILA Pension Trust
Fund, 320 F.3d 151, 163-64 (2d Cir. 2003).

[18] See footnote 14 *supra*.

failed to inform Plaintiff of her right to inspect the relevant plan documents at the Hotel's offices.[19]

Most notably, when Plaintiff requested the plan documents in May 2008, the claims administrator informed her that the 180-page-long Plan document would cost 70 cents per page ($126 in total), and also that Plaintiff would be better off viewing the employee-friendly summary plan document – *but that the summary plan document would not be available for another month or two*.  (Email from JW to AM, May 20, 2008, Ex. 1: BHH 1033.)  This lengthy delay in producing and making available the summary plan document constitutes a clear violation of ERISA procedures, which require summary plan documents to be provided to employees within 60 days of any material alteration in benefits.  29 U.S.C. § 1024(b)(1)(B).  As Ava White testified, the initial Summary Plan Description was not provided to participants until June 2008, and the record suggests that the final revised version was not provided until October 2008.  The Plan's failure to provide the Summary Plan Description is a procedural irregularity that must be taken into account, but its impact is significantly lessened by the fact that the Plan's agents engaged in a good faith effort to inform Plaintiff of the relevant Plan terms.  See Peralta v. Hispanic Business, Inc., 419 F.3d 1064, 1075 (9th Cir. 2005) ("Individual substantive relief under ERISA is available where an employer **actively and deliberately misleads** its employees to their detriment.") (emphasis added).[20]

---

[19] 29 U.S.C. § 1024(b)(2).

[20] Plaintiff attempts to argue that the Plan's failure to provide Plaintiff with a copy of the 2008 Plan or a summary plan description prevents it from applying the terms of the 2008 Plan to Plaintiff's request for benefits.  Plaintiff's sole authority for this proposition is ACS/Primax v. Polan ex rel. Polan, No. 07-0170, 2008

The Plan engaged in another type of irregularity: it requested that Plaintiff sign an unenforceable lien.  The Plan initially asserted that it would not process Plaintiff's benefits claim unless she signed the lien.  The Plan refrained from informing Plaintiff whether or not it would **provide** the benefits; it insisted on obtaining the lien as a precondition to even **considering** Plaintiff's request.  The Plan ultimately backed away from its initial position and addressed Plaintiff's claim on the merits even though Plaintiff never signed the lien.  Nevertheless, the Court notes that the Plan acted improperly by proffering the lien document to Plaintiff.  Ultimately, the lien was irrelevant to the Plan's final July 20, 2008 determination, but the Plan's initial use of the lien was procedurally improper.

There is caselaw suggesting that a Plan may, in its discretion, require a participant to sign a reimbursement agreement before obtaining reimbursable benefits.  See Cagle v. Bruner, 112 F.3d 1510, 1519-20 (11th Cir. 1997).  But in the present case, the Plan improperly insisted that Plaintiff sign a legally invalid and impossible lien. Plaintiff did not personally receive any settlement funds related to Steve's medical care, yet the lien purported to hold Plaintiff **personally** liable for benefits paid for such medical care.  ERISA does not permit a plan to hold a participant personally liable for reimbursement; an ERISA plan may only seek equitable relief via a constructive trust on funds directly traceable to a particular fund or account.  Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204

WL 5213093 (W.D. Pa. Dec. 12, 2008).  This case is addressed in greater detail *infra*, but suffice to say for present purposes that the case does not support Plaintiff's reading of it.

(2002).[21]  Here, Plaintiff did not receive settlement funds related to Steve's medical care, so the Plan would not be permitted to impose a constructive trust on Plaintiff's personal funds.[22]

The lien was also improper because it required Plaintiff to warrant that "no release or discharge has been given with respect to my

---

[21] In <u>Knudson</u>, an ERISA plan participant was injured in a car accident and recovered a $650,000 settlement, of which a residual $250,000 was placed in a special needs trust.  The ERISA plan had expended about $400,000 in providing medical care to the participant, and brought suit against the plan participant seeking reimbursement of the medical costs incurred.  The Court held that 29 U.S.C. § 1132(a)(3) only permits civil actions for equitable relief, and that the sought-after personal judgment was not an equitable remedy.  The Court explained:

> The basis for petitioners' claim is not that respondents hold particular funds that, in good conscience, belong to petitioners, but that petitioners are contractually entitled to some funds for benefits that they conferred. The kind of restitution that petitioners seek, therefore, is not equitable-the imposition of a constructive trust or equitable lien on particular property-but legal-the imposition of personal liability for the benefits that they conferred upon respondents.

<u>Id.</u> at 214.

Later, in <u>Sereboff v. Mid Atlantic Medical Services, Inc.</u>, 547 U.S. 356 (2006), the Court clarified the scope of equitable relief available under ERISA.  The facts were similar to those in <u>Knudson</u>, except that in <u>Sereboff</u> the tort settlement funds were paid directly to the plaintiffs (rather than to a special needs trust) and were retained in a segregated bank account.  Applying the straightforward equitable doctrines of constructive trust and equitable liens, the Court held that the plaintiffs' bank account contained funds directly traceable to the tort settlement.  The relief was equitable because the plaintiff had "specifically identified [1] a particular fund, distinct from the [defendants'] general assets [and] [2] a particular share of that fund to which [plaintiff] was entitled."  547 U.S. at 363-64 (internal citations omitted); <u>see also</u> <u>Administrative Committee for Wal-Mart Stores, Inc. Associates Health and Welfare Plan v. Salazar</u>, 525 F. Supp. 2d 1103, 1111 (D. Ariz. 2007) (applying this two-part test from <u>Sereboff</u>).

[22] In its Responsive Trial brief, Defendant argues that the reimbursement provision only held Ana Martinez liable in her capacity as the residual claimant of the Special Needs Trust.  The lien document plainly contradicts this assertion.

right of recovery" by settlement, judgment or otherwise against the third party responsible for Steve's injury.  Performance of this clause was impossible — the third party's liability had in fact been discharged.  In effect, the Plan was asking Plaintiff to contractually bind herself to perform an impossible act.

Had the Plan's final determination been based on the fact that Plaintiff failed to execute the lien, the Plan's actions likely would have been an abuse of discretion.  See Schikore v. BankAmerica Supplemental Ret. Plan, 269 F.3d 956, 960 (9th Cir. 2001)) ("an error of law constitutes an abuse of discretion."); see also Sluimer v. Verity, Inc., 628 F. Supp. 2d 1099, 1109 (N.D. Cal. 2008) (citing Schikore for this proposition); Miniace v. Pac. Maritime Ass'n, 424 F. Supp. 2d 1168, 1179 (N.D. Cal. 2006) (same); Lundquist v. Cont. Cas. Co., 394 F. Supp. 2d 1230, 1245 (C.D. Cal. 2005) (same).  However, because the Plan's final decision did not refer to the lien, the Court addresses it only as an additional example of the Plan's procedural irregularities.

In addition, the Plan engaged in further procedural irregularities by proffering varying justifications for its decisions.  In the initial interactions between the Plan and Plaintiff, the claims administrator (acting as the Plan's agent) suggested that the benefits decision might turn on whether or not Plaintiff executed the proposed lien.  Later, in the claims administrator's initial denial of benefits on April 18, 2008, Plaintiff's request was denied because of the Plan's clause regarding the availability of "any other source for which benefits would normally be provided for under this Plan."  In the July 20, 2008 final denial, the Plan (this time acting through the Plan

Administrator) explained that the request was denied for three reasons: first, the Plan's clause regarding the availability of "any other coverage, plan, or policy for which a Covered Participant is eligible for benefits"; second, the Plan's subrogation provision; and third, the Plan's reimbursement provision.

It is true, as Plaintiff argues, that Defendant's justifications for denial were something of a moving target.  The only consistent basis for denial was the coordination of benefits provision, but even within this single provision, the Plan quoted two completely separate clauses.  Thus, the Plan Administrator's actions are subject to additional skepticism because the Plan Administrator "add[ed], in its final decision, a new reason for denial." Id. at 974.

Nevertheless, the Plan's reasons for denial were not last-minute additions made in bad faith. Cf. Saffon, 522 F.2d at 872 ("[C]oming up with a new reason for rejecting the claims at the last minute suggests that the claim administrator may be casting about for an excuse to reject the claim rather than conducting an objective evaluation.").  The Plan's communications with Plaintiff consistently focused on a single issue: the third party's responsibility for Steve's injuries and the availability of funds in the Steve Martinez Special Needs Trust.  Although the Plan should have informed Plaintiff of all the relevant plan provisions sooner rather than later, Plaintiff was on notice about the Plan's theory of the case.

It is also noteworthy that the Plan never conferred with legal counsel regarding its decision.  Given that the present case involves a fundamentally legal determination — namely, the interaction between the state-court lawsuit, the Special Needs Trust, and the relevant plan

provisions – it would seem necessary for the Plan to engage counsel
before reaching its decision.  Although there are indications in the
record that the Plan attempted to obtain legal guidance, there is no
evidence that they ever succeeded in retaining counsel.  In fact, the
Plan Administrator herself testified that she never conferred with
counsel.  Although ERISA does not require plans to consult legal
counsel, the Plan's failure to do so could constitute an additional
procedural oversight.

While these procedural irregularities were widespread, they did
not prejudice Plaintiff in her attempt to obtain benefits.  The Plan
did not engage in a "wholesale and flagrant" violation of ERISA
procedures such that the Court should exercise *de novo* review of the
Plan's decision.  As noted *supra*, the standard example of "wholesale
and flagrant" procedural violations is Blau v. Del Monte Corp., 748
F.2d 1348 (9th Cir. 1984), in which the employer kept the plan
documents secret and failed to establish any claims procedure
whatsoever.  In fact, the employer did not even disclose the *existence*
of the plan, let alone permit employees to have their benefits claims
fairly adjudicated.  Id. at 1350-51.  In effect, the employees were
wholly deprived of their rights under ERISA, and had absolutely no
ability to exercise those rights.

In the present case, despite the Plan's various procedural
violations, the Plan ultimately informed Plaintiff of the reasons it
was denying her claim, informed her of the relevant provisions, and
provided her adequate time and opportunity to rebut the Plan's
reasoning.  Throughout the Plan's interactions with Plaintiff, the Plan
and its agents sufficiently quoted and/or summarized the relevant Plan

provisions and explained that the existence of the Special Needs Trust was impeding Plaintiff's recovery of benefits.[23]   In fact, the Plan provided Plaintiff an opportunity to take a further appeal from its July 20, 2008 decision, but Plaintiff refrained from doing so.[24]   This option for a further voluntary appeal mitigates to some degree the procedural irregularities given that Plaintiff was given a "full and fair" opportunity (see 29 U.S.C. § 1133) to examine the plan, formulate a rebuttal, and vindicate her rights under the plan.

In summary, Defendant's decisionmaking process included a number of procedural irregularities, but none of the irregularities affected Plaintiff's substantive rights.   The irregularities did not deprive Plaintiff of the ability to be fully informed of the Plan's justifications for the denial, and Plaintiff was permitted a full and fair opportunity to present her case to the Plan Administrator.   Thus, the procedural irregularities counsel that the Court examine Defendant's decision with a moderate degree of skepticism.

[23] In particular, Julie Wohlstein's initial January 2008 letter containing the proposed lien provided Plaintiff with notice that the request for benefits depended on the relationship between the Plan and the Special Needs Trust.   This information was reemphasized in the April 2008 denial letter.   Further, in late March, Plaintiff wrote a memo reflecting a conversation with one of her providers in which Plaintiff was informed that the Plan was focusing on about the "order of benefit determinations" and the funds in the "trust settlement."   (Ex. 1: BHH 1065.)

[24] Plaintiff's failure to take a so-called "voluntary appeal" does not affect this Court's jurisdiction to review the decision.   Under 29 C.F.R. 2560.503-1(*l*), an ERISA claimant is deemed to have exhausted administrative remedies if the plan fails "to establish or follow claims procedures consistent with" ERISA statutes and regulations. Given the Plan's various procedural inadequacies, this Regulation applies here.   Plaintiff exhausted her administrative remedies, and the July 20, 2008 decision on appeal is the Plan's final decision.

**D.    SUMMARY OF CONFLICTS AND PROCEDURAL IRREGULARITIES**

Ultimately, in light of the Plan's structural conflict of interest and the widespread but technical procedural violations, the Court will review the Plan's decisions under an abuse of discretion standard, but will be "skeptical" per <u>Abatie</u>.

**V.    THE PLAN'S BENEFITS DETERMINATION**

After undertaking a "skeptical" review of the Plan's actions, the Court concludes that the Plan abused its discretion by "constru[ing] provision of the plan in a way that conflict[ed] with the plain language of the plan," and secondarily by committing "error[s] of law" in its analysis.  These shortcoming constitute an abuse of discretion.

**A.    LEGAL STANDARD**

"A plan administrator abuses its discretion if it [1] renders a decision without any explanation, [2] construes provisions of the plan in a way that conflicts with the plain language of the plan, or [3] fails to develop facts necessary to its determination." <u>Anderson v. Suburban Teamsters of Northern Ill. Pension Fund Bd. of Trustees</u>, 588 F.3d 641, 649 (9th Cir. 2009) (citing <u>Schikore</u>, 269 F.3d at 960).  In addition, "[a]s a more general matter, an error of law constitutes an abuse of discretion." <u>Schikore</u>, 269 F.3d at 960 (9th Cir. 2001) (citations omitted).  Or, as stated at greater length by the Ninth Circuit:

> A plan administrator's decision to deny benefits must be upheld
> under the abuse of discretion standard if it is based upon a
> reasonable interpretation of the plan's terms and if it was made

in good faith.  The question we must ask is not whose
interpretation of the plan documents is most persuasive, but
whether the . . . interpretation is unreasonable.  A consistent
pattern of interpretation is "significant evidence" that the plan
administrator acted reasonably in interpreting ambiguous plan
language.

McDaniel v. Chevron Corp., 203 F.3d 1099, 1113 (9th Cir. 2000)
(citations omitted); see also Sznewajs v. U.S. Bancorp Amended and
Restated Supplemental Benefits, 572 F.3d 727, 734-36 (9th Cir. 2009).

**B.   WHETHER THE 2008 OR 2007 PLAN APPLIES**

As a preliminary matter, Plaintiff argues that the 2007 Plan
document should apply to her claim for benefits.

Plaintiff argues that the "Hotel has *always been* the Plan
Sponsor," and that the only change in 2008 was the "*funding* of the
Plan." (Pl.'s Resp. Brief at 1.)  Plaintiff is misguided.  As of
January 2008, the Beverly Hills Hotel and Bungalows **Employee Benefit
Trust** became the Plan Sponsor, and as of January 2008, Plaintiff became
a participant in The Beverly Hills Hotel and Bungalows **Employee Benefit
Trust Employee Welfare Plan**.  Prior to that date, Plaintiff was a
participant in The Beverly Hills Hotel **Health and Welfare Plan**.  (See
Ex. 6: BHH 167.)  These distinctions are not mere technicalities.  They
reflect the fact that the plans are separate legal documents that are
operated by separate legal entities.  Plaintiff offers no evidence or
legal authority that would permit the Court to conclude that the
different plans and entities were alter egos.

At the second day of trial, Plaintiff hinted at another line of
argument.  Plaintiff suggested that the pre-2008 plans apply because

Steve Martinez's injury occurred in 2005, the tort settlement with the School District was completed in 2007, and the current Plan did not take effect until 2008.  Plaintiff argues that governing document is the plan in effect at the time of the injury or the settlement, particularly in a case where, as here, the plan documents were not available to the participant at the time of the participant's request for benefits.

Plaintiff's authorities all involve a distinguishable set of circumstances: in those cases, the ERISA plans **retroactively** sought to recover benefits **already paid** to the plan participants.  In contrast, in the present case, the new 2008 Plan **prospectively** altered the plan language such that Steve Martinez was no longer entitled to recover **future** benefits from the Plan.

In one such case (highlighted by Plaintiff at the second day of trial), <u>ACS/Primax v. Polan ex rel. Polan</u>, No. 07-0170, 2008 WL 5213093 (W.D. Pa. Dec. 12, 2008), the plan administrator sought reimbursement under an amended plan where the vast majority of benefits had already been paid to the participant.  The participant's injury and settlement occurred under the original plan, and the plan administrator in fact paid benefits under the original plan.  The court prevented the administrator from retroactively seeking reimbursement for already-paid benefits.[25]

_____

[25] As an afterthought, the court also held that the plan could not recover "a relatively small portion of the expenses" (about 5% of the total sum) that had been paid after the amended plan went into effect.  The court explained that the plan was responsible for all the costs associated with the injuries that occurred while the old plan was in effect.

This Court respectfully disagrees with this aspect of the <u>ACS/Primax</u> court's holding.  As discussed at greater length *infra*, a

This Court agrees with the general principle expressed in the
ACS/Primax case: a plan may not retroactively recover benefits that
have already been paid to the plan participants.  This is a well-
established principle, and Defendant does not dispute it.  An ERISA
plan simply may not retroactively rescind vested benefits.  See, e.g.,
Wal-Mart Stores, Inc. Associates' Health and Welfare Plan v. Wells, 213
F.3d 398, 403 (7th Cir. 2000) (a plan may not be amended or modified in
a manner that "force[s] plan participants and beneficiaries to **return
benefits already received and spent**") (emphasis added) (citing Member
Services Life Ins. Co. v. American National Bank & Trust Co., 130 F.3d
950, 957-58 (10th Cir. 1997)).

In this regard, Plaintiff appears to misconstrue the nature of the
Plan's denial and the impact of the proposed lien provided to Plaintiff
in January 2008.  The lien, had it been signed, would have reimbursed
the Plan for any funds paid by the plan operated by The Beverly Hills
Hotel & Bungalows Employee Benefit Trust.  (See Ex. 1: BHH 1131.)
Plaintiff claims that the lien would have "allow[ed] the Plan to
recover amounts *already paid by Blue Cross*, as well as amounts *yet to
be paid* through the Benefit Trust." (Pl.'s Trial Brief at 2 (citing
Pl.'s Compl. ¶¶ 12-18).)

---

plan participant's rights to future medical benefits do not vest at
the time of the injury.  Unless the plan provides otherwise, the
right to recover medical benefits vests at the time the covered costs
are incurred.
     As the Ninth Circuit explained in Grosz-Salomon v. Paul Revere
Life Ins. Co., 237 F.3d 1154 (9th Cir. 2001), a plan participant may
not perpetually "invoke the terms of the plan in place when her
injury occurred. . . .  That she became permanently disabled and
filed her disability claim while the first policy was in effect is
irrelevant; it does not entitle her to invoke that plan's provisions
in perpetuity." Id. at 1160.

However, the proposed lien did not purport to have any retroactive effect, and the Plan's three reasons for denying Plaintiff's claims were not retroactive in nature.  Rather, the lien sought to recover for the Beverly Hills Hotel and Bungalows Employee Benefits Trust Plan any payments that the Beverly Hills Hotel and Bungalows Employee Benefits Trust Plan made for Steve's health care.  Similarly, the Plan's denial was based on the fact that the Beverly Hills Hotel and Bungalows Employee Benefits Trust Plan purportedly does not provide benefits in situations such as Plaintiff's.  The Plan simply did not seek to recover amounts already paid by the Blue Cross plan prior to 2008.  Rather, the Plan refused to pay benefits from January 1, 2008 forward.  As a result, Plaintiff's arguments fail.

The Court notes that there is clear, well-established law that permits ERISA health and welfare plans to amend, alter, and even terminate benefits altogether, so long as the changes occur prospectively rather than retroactively.  See, e.g., Grosz-Salomon v. Paul Revere Life Ins. Co., 237 F.3d 1154 (9th Cir. 2001); McGann v. H & H Music Co., 946 F.2d 401 (5th Cir. 1991).

For example, in McGann, "the Fifth Circuit made the malleability of welfare benefit plans brutally clear." See Grosz-Salomon, 237 F.3d at 1160.  After the McGann plaintiff was diagnosed with AIDS, his employer amended the ERISA health plan so that the plan only covered a lifetime maximum of $5,000 worth of AIDS-related expenses. McGann, 946 F.2d at 403.  The court held that the employer was not liable for paying benefits beyond those provided in the plan in place at the time the plaintiff requested the benefits.  The court explained that "ERISA does not require . . . vesting of the right to a continued level of the

1  same medical benefits once those are ever included in a welfare plan."

2  Id. at 405.

3      The Ninth Circuit followed this principle in Grosz-Salomon, 237

4  F.3d at 1160, and reaffirmed it recently in Anderson, 588 F.3d at 650

5  (noting that "ERISA permits employers to cut" benefits available under

6  an employee welfare benefit plan) (citing 29 U.S.C. § 1002(1)).   In

7  Grosz-Salomon, the plaintiff was an attorney who suffered a disability

8  and was unable to work.   Her employer amended the disability plan

9  during the period when she was out of work to add discretionary

10 language.   The court held that the operative plan was the plan in

11 effect at the time of the plan's denial of benefits, stating that "an

12 ERISA cause of action based on a denial of benefits accrues **at the time**

13 **the benefits are denied.**"   Id. at 1159 (emphasis added) (internal

14 quotations omitted).   The court explained that the participant could

15 not "invoke the terms of the plan in place when her injury occurred. .

16 . .   That she became permanently disabled and filed her disability

17 claim while the first policy was in effect is irrelevant; it does not

18 entitle her to invoke that plan's provisions in perpetuity."   Id. at

19 1160.

20     In light of this caselaw, it is incorrect to argue, as Plaintiff

21 does, that a plan participant who suffers a long-term or permanent

22 injury is **permanently** entitled to recover under the plan in effect at

23 the time of the injury.   A plan participant's rights to future benefits

24 do not vest automatically at the time of the injury.[26]   Instead, the

25 participant's rights vest at the time that the covered health-care

26 _____

27 [26] That is, unless the plan clearly provides for such vesting.   The
   plans at issue in this case clearly did **not** provide for permanent

28 vesting, and Plaintiff does not argue as much.

1  costs are incurred.  This is the principle expressed in <u>McGann</u>, 946

2  F.2d at 405, and summarized neatly in <u>Grosz-Salomon</u>, 237 F.3d at 1160.

3  In short, a plan participant is "not entitle[d] to invoke that plan's

4  provisions in perpetuity."  <u>Grosz-Salomon</u>, 237 F.3d at 1160.

5      **C.   THE COURT MAY ONLY REVIEW THE PLAN'S REASONING IN THE JULY**

6          **20, 2008 DENIAL LETTER**

7      In addressing the Plan's actions, the Court looks only to the

8  Plan's **final** benefits determination.  In <u>Booton v. Lockheed Medical</u>

9  <u>Ben. Plan</u>, 110 F.3d 1461 (9th Cir. 1997), the court held than an ERISA

10 plan administrator must set forth the reason for denial "with specific

11 reference to the plan provisions that form the basis for the denial."

12 <u>Id.</u> at 1463.  In addressing ERISA claims, the Ninth Circuit has applied

13 the "general rule that 'an agency's order must be upheld, if at all, **on**

14 **the same basis articulated in the order by the agency itself**,' not a

15 subsequent rationale articulated by counsel."  <u>Jebian v. Hewlett-</u>

16 <u>Packard Co. Employee Benefits Organization Income Protection Plan</u>, 349

17 F.3d 1098, 1104 (9th Cir. 2003) (emphasis added) (quoting <u>Fed. Pow.</u>

18 <u>Comm'n v. Texaco, Inc.</u>, 417 U.S. 380, 397 (1974)).

19     Or, as explained in <u>Abatie</u>, "**[w]hat the district court is doing in**

20 **an ERISA benefits denial case** is making something akin to a credibility

21 determination about the insurance company's or **plan administrator's**

22 **reason for denying coverage** under a particular plan and a particular

23 set of medical and other records."  458 F.3d at 969 (emphasis added).

24 The <u>Abatie</u> court continued:

25     An [ERISA] administrator must provide a plan participant with

26     adequate notice of the reasons for denial, 29 U.S.C. § 1133(1),

27     and must provide a "full and fair review" of the participant's

28

49

claim, id. § 1133(2); see also 29 C.F.R. § 2560.503-1(g)(1),
(h)(2).  When an administrator tacks on a new reason for denying
benefits in a final decision, thereby precluding the plan
participant from responding to that rationale for denial at the
administrative level, the administrator violates ERISA's
procedures.  "[S]ection 1133 requires an administrator to provide
review of the specific ground for an adverse benefits decision."
Robinson [v. Aetna Life Ins. Co.], 443 F.3d [389,] 393 [(5th Cir.
2006)].  **By requiring that an administrator notify a claimant of
the reasons for the administrator's decisions, the statute
suggests that the specific reasons provided must be reviewed at
the administrative level.  Id.  Moreover, a review of the reasons
provided by the administrator allows for a full and fair review of
the denial decision, also required under ERISA.  Id.**  Accordingly,
an administrator that adds, in its final decision, a new reason
for denial, a maneuver that has the effect of insulating the
rationale from review, contravenes the purpose of ERISA.  This
procedural violation must be weighed by the district court in
deciding whether [the plan] abused its discretion.
Id. at 974 (emphasis added).  Notably, the Abatie decision itself, and
various subsequent Ninth Circuit decisions have examined the actual
reasons stated by the plan.  E.g., Pannebecker v. Liberty Life
Assurance Co. of Boston, 542 F.3d 1213 (9th Cir. 2008); Saffon, 522
F.3d at 870.

Thus the Court will only examine the reasoning set forth in the

1  July 20, 2008 decision.[27]

2      D.   DISCUSSION AND ANALYSIS OF PLAN'S DECISION

3      In the operative denial letter, the Plan explained that it was

4  relying on three provisions: the "coordination of benefits" provision,

5  the "subrogation" provision, and the "reimbursement" provision.   (Ex.

6  1: BHH 1021.)

7      Under the abuse of discretion standard, Defendant is only liable

8  if it "construe[d] provisions of the plan in a way that conflicts with

9  the plain language of the plan," Anderson, 588 F.3d at 649, or if it

10  committed "an error of law" in reaching its decision.   Schikore, 269

11  F.3d at 960.[28]

12      When construing an ERISA plan's terms under an abuse of discretion

13  review, the Court will find that the Plan abused its discretion if it

14  _____

15  [27] The Court wishes to emphasize that it is **not** reviewing the reasoning
    and justification set forth in the initial April 18, 2008 denial
16  letter.   That letter quoted the following language: "Benefits
    available from this Plan shall always be considered only after all
17  available benefits have been paid from any other coverage, plan, or
    policy of benefits in which the Covered Participant participates,
18  whether as a member of a group or as an individual, or *after*
    *reimbursement of the expenses from any other source* for which
19  benefits would normally be provided for under this Plan."   (Ex.1, at
    BHH 1048.)   The language highlighted by Community Administrators may
20  be a sufficient basis for the denial, but the Court is not in a
    position to reach this conclusion.   While this was the reason for the
21  initial denial, it was not set forth as a reason for the final
    denial.
22

23  [28] The other two main bases for abuse of discretion are not present in
    this action.   See Anderson, 588 F.3d at 649 ("A plan administrator
24  abuses its discretion if it renders a decision without any
    explanation, construes provisions of the plan in a way that conflicts
25  with the plain language of the plan, or fails to develop facts
    necessary to its determination.")
26      Here, Defendant provided explanations for its actions, and
    Plaintiff does not allege that Defendant's decision was based on
27  inadequate fact-finding.   Accordingly, these bases for review are
    irrelevant.
28

applied an unreasonable interpretation of plan terms.  If the plan terms are ambiguous, then the court defers to the plan's reasonable interpretation.  However, if the plan terms are unambiguous, then the court must apply the unambiguous meaning of those terms, even under an abuse of discretion review.  See Gilliam v. Nevada Power Co., 488 F.3d 1189, 1194 (9th Cir. 2007); see also Saffle v. Sierra Pac. Power Co. Bargaining Unit Long Term Disability Income Plan, 85 F.3d 455, 458 (9th Cir. 1996) (stating that a plan administrator "abuses its discretion if it construes provisions of the plan in a way that 'conflicts with the plain language of the plan'").

### 1.  Subrogation

The subrogation clause states:

> This Plan has a right to subrogate for claims it pays.  This means if a Covered Participant recovers, or[] has the right to recover monies from any third parties (i.e., insurance policies or claims of any type against any other entity for the same occurrence), the Plan may, solely at its option make a claim for the funds previously paid on behalf of a Covered Participant.  This means the Plan has a lien on any amounts a Covered Participant recovers from any third party.  Covered participants are required to cooperate fully in the exercise of such subrogation rights, and shall do nothing to prejudice such rights and shall do everything necessary to secure such rights.  If the Plan cannot subrogate, it will exercise its right of reimbursement.

(A.11.7, Ex. 1: BHH 378.)

Notably, the provision uses only the **present and future** tenses.  At the time the Plan decided Plaintiff's claim, this provision no longer applied.  The provision only applies if "Covered Participant **recovers**, or[] **has the right** to recover monies from any third parties." (Emphasis added.)  The effect is that "the Plan has a lien on any amounts a Covered Participant **recovers** from any third party." (Emphasis added.)

By the time that the Plan was in effect, Plaintiff and her son had

**already recovered** from the third party.  In addition, because Plaintiff had already recovered, she no longer qualified under the plain terms of the subrogation provision.  The provision requires that the participant "shall do nothing to prejudice such rights and shall do everything necessary to secure such rights."  Again, by the time the Plan took effect, Plaintiff had **already prejudiced** the Plan's rights and **could not** do anything to assist the Plan in securing its rights.

At the second day of trial, the Plan Administrator even admitted that this provision does not apply to Plaintiff.  This conclusion is supported by an examination of the language of a neighboring plan clause.  The "Limitation of Plan Recovery Rights" provision provides that: "The Plan may subrogate **but will not be able to** if the responsible third party extinguishes its liability to a Covered Participant or is relieved of liability by contract or operation of law.  The Plan will then exercise its right of reimbursement." (A.11.9, at Ex. 1: BHH 378, emphasis added.)

In Plaintiff's case, the Plan was unable to exercise its subrogation rights because Plaintiff had previously settled her claim against the school district, thus "extinguish[ing]" the school district's continuing liability.  Under the plain language of this provision, the Plan was obligated to use the reimbursement provision rather than the subrogation provision.

Thus, per the Plan documents, the Plan improperly relied on the subrogation provision.

### 2.   Reimbursement

The reimbursement clause is also inapplicable.  The clause provides that "If a Covered Participant **is injured** through the act or

omission of another person, the benefits of this Plan shall be provided only if the Covered Participant shall agree in writing [to reimbursement, a lien, and subrogation]." (A.11.8, at Ex. 1: 378, emphasis added.)[29]  Notably, the Plan defines the term "injury" as a accidental bodily injury "sustained by a Covered Individual **while such Covered Individual is covered under the Plan**." (A.2.53, Ex. 1: BHH 300, emphasis added.)

The reimbursement provision cannot apply to Plaintiff's son because the Plan did not exist at the time of the injury.  By the Plan's plain language, an "injury" must occur during a time when the

_____

[29] The complete reimbursement provision reads:
      If a Covered Participant is injured through the act or omission
      of another person, the benefits of this Plan shall be provided
      only if the Covered Participant shall agree in writing:
             -to act as the agent for the Plan in seeking and obtaining
      recovery from third parties;
             -to hold all recoveries from third parties in constructive
      trust for the Plan;
             -to reimburse the Plan to the extent of benefits provided,
      immediately upon collection of damages by him, whether by legal
      action, settlement, arbitration, mediation, or otherwise;
             -to provide the Plan with a Lien and Order Directing
      Reimbursement to the extent of benefits provided by the Plan,
      which lien and order may be filed with the person whose act
      caused the injuries, the Covered Participant's agent or insurer,
      the court, or the attorney representing the Covered Participant;
      and,
             -that a representative of the Plan shall have the right to
      intervene in any suit or other proceeding to protect the
      reimbursement rights hereunder.  The Covered Participant shall
      be responsible for all fees of the attorney handling the Covered
      Participant's claim against the third party and all costs
      incurred by said attorney in pursuit of the Covered
      Participant's claim."
(A.11.8, at Ex. 1: BHH 378.)
      This provision clearly contemplates that any causes of action
against the responsible third party have not been extinguished.  To
the extent that a cause of action is extinguished, the required
written agreement would require the Covered Participant to agree to
impossible acts such as permitting the Plan to participate in ongoing
litigation and negotiations.

Plan is in effect and the injured person is covered by the Plan.  That is simply not the case here, so the reimbursement provision is inapplicable.

### 3.   Coordination of Benefits

In addressing the lengthy "coordination of benefits" provisions, the Plan's July 20, 2008 decision relied on a specific "excerpt" quoted in the body of the denial letter.  (See Ex. 1: BHH 1021.)  The excerpt reads: "Benefits from this Plan are always considered only after all available benefits have been exhausted from any other coverage, plan, or policy for which a Covered Participant is eligible for benefits, whether the Covered Participant is entitled to coverage as a member of a group or as an individual and includes any benefits that would have been payable had a claim been properly made for them."  (A.11.1, at Ex. 1: BHH 376.)[30]

---

[30] The "coordination of benefits" provisions as a whole provide:
> If an individual covered under this Plan is also covered under one or more other plans or is eligible for reimbursement of expenses for which benefits would normally be provided for under this Plan from any other source, the benefits payable under this Plan will be reduced by those payable under all other plans or other sources so that the total payments under this Plan and all other plans do not exceed 100% of covered expenses. Benefits from this Plan are always considered only after all available benefits have been exhausted from any other coverage, plan, or policy for which a Covered Participant is eligible for benefits, whether the Covered Participant is entitled to coverage as a member of a group or as an individual and includes any benefits that would have been payable had a claim been properly made for them.  In no event will the payment under this Plan be larger than would have been made in the absence of this coordination of benefits provision. Benefits payable under all other plans include the benefits that would have been payable had a claim been properly made for them.  Benefits provided as a result of concurrent coverage under Medi-Cal or MedicAid are not subject to the provisions of this Section.

(A.11.1, at Ex. 1: BHH 376.)

Simply stated, the quoted language only applies to **insurance policies**, not the Special Needs Trust.  The quoted excerpt only discusses coordination of benefits with another "coverage, plan, or policy."  The Special Needs Trust is simply not a "coverage, plan, or policy."

The Plan specifically defines "plan" in this context in a manner that appears to apply to the phrase "coverage, plan, or policy":

> A Plan is any labor-management trusteed plan, union welfare plan, employer organization group plan, school plan, employee benefit organization plan, prepaid group practice, or Blue Cross or Blue Shield plan, by whatever name called, benefits payable under Title XVIII of the Social Security Act of 1965, as amended (Medicare), Parts A and B, and any coverage required or provided by statute, including no-fault auto insurance or similar provisions.  Medicare benefits are normally required to be secondary by law.

(A.11.2, at Ex. 1: BHH 376.)

Even if the Plan's specific definition of "plan" does not apply to the words "coverage" or "policy," Black's Law Dictionary provides a useful reference.  Accord Gilliam v. Nevada Power Co., 488 F.3d 1189, 1195 (9th Cir. 2007) (looking to Black's Law Dictionary to construe plain language of ERISA plan).  According to Black's, "Coverage" is defined as "[i]nclusion of a risk under an **insurance** policy; the risks within the scope of an **insurance** policy." (Black's, at 422, emphasis

---

> Benefits available from this Plan shall always be considered only after all available benefits have been paid from any other coverage, plan, or policy of benefits in which the Covered Participant participates, whether as a member of a group or as an individual, or after reimbursement of the expenses from any other source for which benefits would normally be provided for under this Plan.  In the event that the Covered Participant is eligible for benefits through a plan or policy which contains a similar provision which places that plan or policy in the position of a secondary payor, the rules establishing the order of benefit determination are . . . [etc. – sets forth priority rules, with the Plan generally taking lowest priority].

(A.11.3, at Ex. 1: BHH 376.)

added.)  "Policy" is defined as "[a] document containing a contract of **insurance**."  (Black's, at 1276, emphasis added.)

In short, "policy, plan, or coverage" embraces only insurance.[31] It was therefore unreasonable for the Plan Administrator to construe "policy, plan, or coverage" as embracing the Special Needs Trust, which is a **trust**, not an **insurance policy**.[32]  Black's explains that a trust is a "right . . . to the beneficial enjoyment of property."  Black's at 1647.  In contrast, insurance is a "contract by which one party . . . undertakes to indemnify another party . . . against risk of loss, damage, or liability."  Black's at 870.

Needless to say, a "trust" is not a form of "insurance."  It was therefore unreasonable for the Plan to deny Plaintiff's claim on the basis of this interpretation of the Plan.

In addition, there simply is no Plan provision that supports the Plan Administrator's conclusion that Steve's claims were excluded "because there was another party who was determined to be responsible

---

[31] The Court notes that the result might be different if it were engaging in a pure abuse of discretion review without adding any additional skepticism to its review.  Had the Plan's conduct not been marked by procedural irregularities and a structural conflict of interest, the Court would be more willing to credit the Plan's conclusion that the words "any other coverage" might apply to the Special Needs Trust.

[32] "A special needs trust is a form of **discretionary spendthrift trust** designed to preserve public assistance benefits for a disabled beneficiary."  14 B.E. Witkin et al., Summary of California Law: Wills and Probate § 1072 (2009 update) (emphasis added); see also 22 Cal. Law Rev. Comm., "Recommendation: Special Needs Trust for Disabled Minor or Incompetent Person," in Annual Report for 1992 989, 993 (1992) (same).  A special needs trust "is a **trust** that is intended to allow the beneficiary to continue to maintain eligibility for certain needs-based government benefits such as S.S.I. or Medi-Cal."  Shewry v. Arnold, 125 Cal. App. 4th 186, 194 (2004) (emphasis added).

for charges which resulting [sic] from Steven's injury/illness."  None of the cited provisions support this statement.  The cited Plan provision do not prevent participants from recovering benefits for costs associated with third-party caused injuries.

In short, the Plan abused its discretion by construing the terms of the Plan in an unreasonable manner.

**VI.   REMEDY**

The proper remedy is explained in <u>Pannebecker v. Liberty Life Assurance Co. of Boston</u>, 542 F.3d 1213 (9th Cir. 2008):

> [t]he ERISA claimant whose initial application for benefits has been wrongfully denied is entitled to a different remedy than the claimant whose benefits have been terminated.  **Where an administrator's initial denial of benefits is premised on a failure to apply plan provisions properly, we remand to the administrator to apply the terms correctly in the first instance.**  But if an administrator terminates continuing benefits as a result of arbitrary and capricious conduct, the claimant should continue receiving benefits until the administrator properly applies the plan's provisions.

<u>Id.</u> at 1221 (emphasis added); <u>see also</u> <u>Saffle v. Sierra Pacific Bargaining Plan</u>, 85 F. 3d 455, 461 (9th Cir. 1996) ("remand for reevaluation of the merits of a claim is the correct course to follow when an ERISA plan administrator, with discretion to apply a plan, has misconstrued the Plan and applied a wrong standard to a benefits determination.").

1   This case involves an incorrect decision to **deny** benefits, not an
2   incorrect decision to **terminate** ongoing benefits.  Accordingly, the
3   Court must "remand to the administrator to apply the terms correctly in
4   the first instance."  <u>Pannebecker</u>, 542 F.3d at 1221.

6   **VII. COUNTERCLAIM**

8   In a counterclaim, the Beverly Hills Hotel and Bungalows Employee
9   Benefit Trust seeks injunctive and declaratory relief against Plaintiff
10  and U.S. Bancorp (the trustee of the Special Needs Trust) that the
11  Employee Benefit Trust is entitled to a lien on the funds in the Steve
12  Martinez Special Needs Trust, as well as reimbursement for future funds
13  that will expended by the Employee Benefit Trust if it provides health
14  care to Plaintiff's son.
15  The Court refrains from deciding the counterclaim.  In light of
16  the decision *supra* regarding the parties' rights and obligations under
17  the Plan, the counterclaims are not ripe for decision.

19  **VIII.    CONCLUSION**

21  For the reasons stated, the Court finds that Defendant abused its
22  discretion when denying Plaintiff's request for benefits.  DECLARATORY
23  JUDGMENT shall be entered for Plaintiff Ana Martinez against Defendant
24  The Beverly Hills Hotel and Bungalows Employee Benefit Trust Employee
25  Welfare Plan.
26  The Court REMANDS the matter to Defendant to apply the Plan's
27  terms in accordance with this Order.  Plaintiff's claim for benefits

shall be deemed renewed as of the date this Order is entered on the docket.  Defendant's decision on remand is subject to the statutory and regulatory requirements of ERISA.

The counterclaim brought by Counterclaimant (The Beverly Hills Hotel and Bungalows Employee Benefit Trust Employee Welfare Plan) is DISMISSED WITHOUT PREJUDICE.

**FINAL JUDGMENT**

In accordance with the foregoing Findings of Fact and Conclusions of Law, DECLARATORY JUDGMENT is hereby entered in favor of Plaintiff Ana Martinez.  It is hereby ORDERED, ADJUDGED, and DECREED that Defendant The Beverly Hills Hotel and Bungalows Employee Benefit Trust Employee Welfare Plan violated Plaintiff Ana Martinez's statutory rights under ERISA.

IT IS SO ORDERED.

DATED:___ March 9, 2010 _____          _____

                                                    STEPHEN V. WILSON

                                             UNITED STATES DISTRICT JUDGE